```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
                      NORTHERN DIVISION

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,      :
                              :
      v.                       :        Criminal No. GLR-22-140
                              :
DONTE DAVON STANLEY,           :
                              :
          Defendant.           :
                              :
- - - - - - - - - - - - - - - x        August 17, 2022

                                       Baltimore, Maryland


                       DETENTION HEARING


      BEFORE:   THE HONORABLE A. DAVID COPPERHITE, Judge

APPEARANCES:          ABIGAIL TICSE, ESQ.
                      Office of the U.S. Attorney
                      36 S. Charles St.
                      Baltimore, MD  21201
                        On Behalf of the Government

                      GARY E. PROCTOR, ESQ.
                      JENNIFER ELIZABETH SMITH, ESQ.
                      Law Offices of Gary E. Proctor, LLC
                      Eight E. Mulberry St.
                      Baltimore, MD 21202
                        On Behalf of the Defendant

Audio Operator:       Christina Barnickel

Transcription Company:  CompuScribe
                      PO Box 789
                      Cheltenham, MD  20623-9998
                      (301) 577-5882


Proceeding recorded by electronic sound recording, transcript
produced by transcription service.
```

I  N  D  E  X

                                                                    Page

Preliminary Matters                                                   3

Comments by Abigail Ticse, Esq.
  On Behalf of the Government                                         4

Comments by Gary Proctor, Esq.
  On Behalf of Defendant Donte Stanley                              14

Rebuttal by Abigail Ticse, Esq.                                     23

Ruling by Judge A. David Copperthite                                26

KEYNOTE:  "---" indicates inaudible in the transcript.
          "*"  indicates word is phonetically spelled.

1                          P R O C E E D I N G S

2         (Whereupon, at 1:46 p.m., the proceeding began.)

3              THE CLERK:  All rise.  The United States District

4    Court for the District of Maryland is now in session.  The

5    Honorable A. David Copperthite presiding.

6              THE COURT:  Good afternoon, everyone.  You can be

7    seated.  Ms. Ticse?

8              MS. TICSE:  Good afternoon, Your Honor.  United

9    States versus Donte Davon Stanley, Case Number GLR2214.  Abby

10   Ticse on behalf of the Government, and I am joined at counsel

11   table by Special Agent Andrew Vowa* of the FBI.  And I did

12   want to let the Court know that there are also some family

13   members of victims present here today.  Good afternoon, Your

14   Honor.

15             THE COURT:  Okay, good afternoon.  And Mr. Proctor

16   or Ms. Smith.

17             MR. PROCTOR:  Both of us.  Good afternoon.  How are

18   you, Judge?  Gary Proctor for Mr. Stanley.  And we are indeed

19   here for a detention hearing.

20             THE COURT:  Okay, good to see you, Mr. Proctor.  And

21   Ms. Smith, good to see you as well.  You can be seated.  Has

22   everyone received a copy of the pretrial services report?

23             MS. TICSE:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MR. PROCTOR:  Yes, sir.

4

1              THE COURT:  And also I believe there was a letter

2    dated August 11, that was forwarded to me from Mr. Budlow.

3    And I believe the defense was also copied on that.  Is that

4    correct?  Okay.

5              I just want to make sure that we all have everything

6    that we need.  Are we ready to proceed?

7              MS. TICSE:  Yes, Your Honor.

8              MR. PROCTOR:  Yes, sir.

9              THE COURT:  All right.  Ms. Ticse, I am happy to

10   hear from you.

11             MS. TICSE:  Sure.  Thank you, Your Honor.  The

12   Defendant is charged in this case with kidnapping, kidnapping

13   conspiracy, Hobbs Act and Hobbs Act conspiracy, carjacking,

14   and because he is a also charged with the use of firearm in

15   the commission of a crime of violence, there is a presumption

16   that there are no conditions or combination of conditions that

17   could reasonably assure his attendance at trial or the safety

18   of the community.

19             And based on the absolutely horrific nature of this

20   case and the Defendant's history, he cannot overcome that

21   presumption, and there are no conditions that can assure the

22   safety of the community, his attendance at trial or prevent

23   him from obstructing justice.

24             First is the nature and circumstances of the

25   offense.  As the Court saw from the letter that we submitted

1    and in advance of today, this case stems from the violent,

2    violent, three violent abductions that occurred from May

3    through August of 2021.

4           Two of them were also carjackings.  The Defendant

5    and at least three of his associates impersonated police

6    officers, wearing tactical vests that said police, badges,

7    guns drawn.  Had a police light on their car, and masks over

8    their head.  Approached three different individuals,

9    blindfolded them, either zip-tied them, handcuffed them and

10   put them in the back of one of their vehicles.

11          The first victim was an employee of a check-cashing

12   business.  And she was pulled over when she was leaving work.

13   She was bound, put in the back of their vehicle, and they

14   wanted codes to the safes at her business.

15          She didn't have them.  So what did they do when she

16   couldn't provide the answers to their questions or the answers

17   that they wanted?  They burned her with a blowtorch.

18          Not only that, but they took her clothes off.  They

19   took her shirt off, her bra off, her pants off and burned her

20   when she could not provide them with access to the safes that

21   they wanted.

22          They kept her for hours overnight.  And this victim

23   is not here today because over a year later she just got out

24   of the emergency room due to infections from the burns that

25   they caused her on her chest.

1          The second victim was pulled over again by the

2    Defendant and his associates impersonating police officers,

3    bound, taken out of his car, put in the back of their vehicle.

4    They thought that he was a drug dealer, a small-time drug

5    dealer but he didn't have the drugs or the money that they

6    wanted so what did they do?  They burned him with a blowtorch,

7    kept him for hours overnight before they ultimately released

8    him.

9          The third victim, she was on foot.  An employee of a

10   check-cashing company.  Again, picked her up, impersonating

11   themselves as police officers, told her she had a warrant for

12   her arrest.  Put her in the back of their vehicle and kept her

13   there throughout the entire night for hours before they

14   ultimately released her.

15         So the nature and circumstances of this case can't

16   really get much worse, Your Honor, and certainly they weigh in

17   favor of detention.

18         The weight of the evidence against this Defendant in

19   particular is also very strong and weighs in favor of

20   detention.  I am not going to go through everything that was

21   set forth in the letter that we submitted but just briefly,

22   Your Honor, the Defendant and his co-Defendants, who were

23   charged, made a few mistakes along the way.

24         They used what we call burner phones or pre-paid

25   phones to call associates or family members of two of the

1   victims.  And based on the location of those burner phones,

2   and the communication between those phones and some of the

3   personal phones, or other phones related to the Defendant and

4   his co-Defendants, we were able to track the location and tie

5   these phones to the Defendant and his co-Defendants.

6           Specifically, as to Mr. Stanley, his personal phone

7   had contact with at least one of the burner phones.  And

8   hundreds of contacts with the three personal phones of his co-

9   Defendants during the time period in question.

10           Two of his co-Defendants, Mr. Dorsey and

11   Mr. Hairston, are caught on camera purchasing two of the

12   burner phones used during the abductions.  And they were

13   arrested with three of them on them.

14           The Defendant, Mr. Stanley, also used his personal

15   phone to talk or communicate with the co-Defendants in

16   preparation of, during and after the three abductions here.

17           As to the first abduction, his personal phone used a

18   cell tower at the abduction site just two days before,

19   consistent with planning the abduction.  And was in

20   communication with the other Defendants' phones days prior and

21   the day of the abduction.

22           During the abduction, he left his personal phone at

23   his co-Defendant Mr. Smith's residence while they committed

24   the abduction and then he came back to retrieve it.

25           As to the second abduction, the Defendant's phone

 1  was at the same residence as the burner or prepaid phone and

 2  his co-Defendant's personal phones the day before and in the

 3  same area as the abduction during the adduction.

 4        Regarding the third abduction, the Defendant's phone

 5  was by co-Defendant Hairston's residence along with another

 6  burner phone the afternoon of the ab duction, and was present

 7  at the area of the abduction with four burner phones that were

 8  used during this crime.

 9        Co-Defendants' personal phones were also regularly

10  at Mr. Stanley's residence as well as two of the burner

11  phones.  One of them that was used in the third abduction also

12  spent the night at Mr. Stanley's residence the night of the

13  third adduction.

14        Even more significantly is the evidence that was

15  seized from the Defendant's residence as well as his co-

16  Defendant's residence.

17        His house was searched, and multiple pieces of

18  evidence that tied directly to this crime were seized,

19  including one of the black tactical vests that said police, a

20  drone, a tracking device, and a blue blowtorch that matches

21  the exact description given by the victim in this case.

22        The Defendant was not home when his residence was

23  searched.  And when he was ultimately apprehended four months

24  later, the apartment that we believe he was staying in also

25  had a gun and shell casings in it.

1                 And in addition to the tactical vest that was in

2      Mr. Stanley's residence, it was identical to two other

3      tactical vests that said police on it that were at his co-

4      Defendant Mr. Dorsey's residence with the rest of the

5      abduction kit, as we call it, which included zip ties,

6      handcuffs, police radio, badges, and the police light that was

7      used on the vehicle to pull over the victims.

8                 At his other co-Defendant Mr. Smith's house, we also

9      found a badge and another blue blowtorch.  So obviously the

10     evidence against the Defendant is very strong here.

11                And as to his history and characteristics, the

12     Defendant is a very dangerous man.  Starting with his criminal

13     history, it is extensive.  We included many but not all of his

14     arrests and convictions in the letter that we submitted to the

15     Court --

16                THE COURT:  Before -- I am sorry, Ms. Ticse.  Before

17     we got to that, also in your letter you said that, you talk

18     about what was seized from Mr. Stanley's residence: blue

19     blowtorch, black vest with police on it, identical to the vest

20     from Dorsey's.  A drone GPS tracking device, two go-pro

21     cameras, several phones and ammunition for a 9-millimeter

22     handgun.

23                And then the -- you state that Mr. Stanley didn't

24     return to his employment because he received phone calls

25     telling him about the search warrant.  And on April 7th, 2022,

1   the apartment he was residing in was searched, and a 9-

2   millimeter handgun was recovered with an extended magazine, an

3   attached light, a magazine with 17 rounds of additional

4   ammunition, flash drive, wireless router, Tracfone, a receipt

5   for the purchase of the Tracfone.  That is all correct?

6                MS. TICSE:  That is correct, Your Honor.

7                THE COURT:  All right.

8                MS. TICSE:  Thank you.

9                THE COURT:  Go ahead.  I am sorry.

10               MS. TICSE:  I appreciate it.  Thank you.  As to the

11  Defendant's criminal history, we didn't include all of his

12  arrests or convictions in our letter, but we did highlight a

13  few.

14               Including sex offense charges and arson, two of

15  which are very, very related to the substance of the

16  allegations in this case.

17               Further evidence that he is a danger to the

18  community here is the fact that seven different individuals

19  have sought court intervention for a protective order or peace

20  order to protect themselves from the Defendant, the most

21  recent being August 2nd, I believe, 2021, the date of the 3rd

22  abduction in this case, Your Honor, and the allegations that

23  supported the peace order in that case was that the Defendant

24  pointed a gun at a -- I am sorry, threatened a gun, threatened

25  a 7-year-old child with a gun, punched her, and placed her

1    into hot water.

2              So clearly this is a very dangerous man continuing

3    through at least August of 2021.

4              He also has multiple guilty dispositions for

5    violations of probation, clearly indicating he has no respect

6    for the court authority here.

7              And regarding the Defendant's flight, he has two

8    charges for fleeing and eluding.  He had -- well, I will get

9    to that in a second.  He was convicted of escape, and when his

10   home was searched in this case, as Your Honor just stated, he

11   got a call to work, left work, never returned to work.  Never

12   used the phone that we had, the phone number that we had for

13   his personal phone, again.  And was on the run for four

14   months.

15             So clearly there is an indication that he will flee

16   if released.  He also had a trial date in Baltimore County

17   while he was on the run, and didn't appear for that.  It is my

18   understanding that he has since resolved that but only because

19   he has been incarcerated.  So there is absolutely every

20   indication that if released he will also flee.

21             And going -- the Defendant's background also

22   indicates that he will obstruct justice.  Again in August of

23   2021, his co-Defendant, Dennis Hairston, was arrested on an

24   unrelated charge, and there was a recorded call from

25   Mr. Hairston while he was incarcerated to Mr. Stanley,

1    essentially telling him to remove evidence from Mr. Hairston's

2    girlfriend's vehicle that was used in the burglary the night

3    before.

4           Mr. Stanley essentially says, it has been taken care

5    of.  They describe a window being broken to get the evidence

6    out, and consistent -- we had surveillance done, and

7    consistent with that conversation, a window was broken in that

8    same vehicle.

9           So the Defendant is not only a danger to the

10   community, a risk of flight, but there is also a big risk that

11   he would obstruct justice.

12          And I understand that the third-party custodian in

13   this case is the Defendant's girlfriend Kiersten Austin.  I

14   will note for the Court she may be willing, but she is not

15   suitable a third-party custodian.  I have met Ms. Austin.  I

16   met Ms. Austin in January of 2022 after the Defendant's

17   resident was searched.

18          Ms. Austin was well aware that there was a warrant

19   for the Defendant, that his home was searched, and that law

20   enforcement was looking for him.  It is my understanding that

21   Ms. Austin is approximately five months pregnant, which means

22   not only was she in communication with the Defendant while he

23   was on the run, but she obviously saw the Defendant.  It is my

24   understanding it is the Defendant's child.

25          Additionally Ms. Austin indicates the Defendant was

1    residing at her then-residence several nights a week from I

2    believe May through November 2021.  So the same time period

3    that the crimes in this case were committed.

4            So that is someone who the Defendant felt

5    comfortable committing these crimes and going to lay his head

6    next to Ms. Austin.

7            So I don't believe that there is any indication that

8    she would be an appropriate third-part custodian in this case.

9            And for those reasons, Your Honor, we would suggest

10   that the Defendant cannot overcome the presumption that there

11   are no conditions that can reasonably assure that safety of

12   the community, his attendance at trial or prevent him for

13   obstructing justice.

14           THE COURT:  And one other thing.  You mentioned that

15   there was, he was charged with a sex offense, an attempted

16   rape, I believe, at one point.  That case was resolved

17   otherwise as a second-degree assault, I believe.

18           MS. TICSE:  That is correct, Your Honor.

19           THE COURT:  What he pled to.  And the relevance of

20   that was that Victim Number 1 alleged that she was sexually

21   assaulted as well.  I don't think you mentioned that.

22           MS. TICSE:  That is correct, Your Honor.  I

23   apologize.  There is indication that Victim Number 1 was

24   sexually assaulted.  They removed all of her clothing and not

25   only burned her but did sexually assault her.

 1          THE COURT:  Okay.

 2          MS. TICSE:  Thank you, Your Honor.

 3          THE COURT:  All right.  Mr. Proctor or Ms. Smith.

 4   You are welcome to take that off while you speak.

 5          MR. PROCTOR:  So let me first of all tell you what

 6   we are requesting, which is home detention, under very

 7   stringent conditions, allowed to leave his house for very

 8   limited purposes such as doctor's appointments, to meet with

 9   his counsel, to come to court.

10          We are not by any means suggesting that this is just

11   check in with pre-trial monthly.  We agree to the most

12   strident conditions Your Honor can fashion in connection with

13   release.

14          I guess I will finish with where the Government left

15   off, which is Ms. Austin.  She has no record, no contact with

16   the criminal justice system at all.  She works at child care.

17   There is another person present in the house who would, you

18   know, agree when she is out, to monitor my client closely.

19          I believe they are as good as third-party custodians

20   get.  No substance abuse.  Certainly she is not using now.

21   She is pregnant.

22          So we believe that burden can be overcome by finding

23   a  -- and they are all here, Judge.  I will mention who is here

24   in a minute.  They are all willing to make sure that this man,

25   if released, abides by the conditions the Court sets.

1              So normally at a detention hearing, I don't know

2       anything about the evidence.  I just got the case the day

3       before yesterday.  We are bit different here, Judge, because

4       we did initially consent to detention, and we have come back.

5              So let's talk about that a little if we may.  The

6       Government, and I don't fault them for this, but they kept

7       saying, they did this and they did that.  And I agree with

8       them that these are really serious crimes but my client's

9       linking to it is tangential at best.

10             Let's look at what the Government can prove what he

11      did, not what they did.  It's clear that he is socially

12      friends, acquaintances, whatever you want to call it, with

13      Mr. Hairston, Mr. Dorsey and Mr. Smith.  That much is clear.

14             The first abduction the Government told you that his

15      phone was in the area two days prior, it was right next to a

16      shopping center, Judge, near where he was working.

17             THE COURT:  So you are suggesting he was shopping?

18             MR. PROCTOR:  It is also in the vicinity of an auto

19      shop that the Government has confirmed he works at.

20             So I am suggesting he was either at the auto shop or

21      popped out to get lunch.  You know, there is a liquor store,

22      there are all sorts of things there.  It is apropos of not

23      much, is what I am saying.

24             THE COURT:  Okay.

25             MR. PROCTOR:  Mr. Smith's house, where the

1   Government is saying Mr. Stanley's phone popped up, it is

2   where he grew up.  It is in the same neighborhood.  You know,

3   the Government talks about how his phone was turned off at the

4   time of the crime?  That is another way of saying it just

5   wasn't there.  It just wasn't there.

6           You know, the link to my client being involved in at

7   least the first abduction.  They talked about how the victim

8   was stripped naked and -- there is two things to talk about

9   that from discovery.  One is the victim describes the person

10  who stripped her naked and sexually assaulted her.  In his

11  50s.  It doesn't sound like Mr. Stanley.

12          I haven't met the other co-Defendant; I can't tell

13  you which Defendant is does sound like but it doesn't sound

14  like Mr. Stanley.

15          And that victim goes on to say when the other guys

16  show up, they are shocked that she is there naked.  So to the

17  extent this horrible thing happened, A, it wasn't Mr. Stanley,

18  and even if you believe the Government's proffer that he

19  showed up later, he would have been, by the victim's own

20  testimony, shocked that this thing had happened.

21          The second abduction, they say, first of all they

22  say his phone was silent during it, and then they say it was

23  in the same area as the other target telephones during the

24  abduction.

25          You know, when you look at the discovery, his phone

1    was in the area of St. Agnes Hospital at 3 a.m.  That is it.

2    That is how they tie him to this crime.

3           That is the quantum of the evidence: At 3 a.m., his

4    phone was around St. Agnes Hospital.

5           The third abduction, it says his phone was present

6    at Hairston's residence the afternoon of the abduction.  Again

7    I will concede they were acquaintances.  And it was present in

8    the area where the victim was later dropped off.

9           Where the victim was later dropped off was Edmonston

10   Village Shopping Center so his phone was at a shopping center.

11   Again it is not exactly a smoking gun.

12          Ms. Austin, the proposed third-party custodian,

13   lived in that area at that time.  So at some point later he is

14   the vicinity of her house or Edmonston Village Shopping

15   Center.

16          You know, the Government talked about how Dorsey and

17   Smith's phones, and some of the burner phones were used near

18   my client's house.  All right.  His house is right by a Golden

19   Ring Walmart where they were seen buying the cell phones.  The

20   Government told you that, not me.

21          We also know that Mr. Hairston, when we talk about

22   the tactical vests and the blow torch and all that sort of

23   thing, don't take my word for it.  The Government's own

24   witnesses say Mr. Hairston was living at Mr. Stanley's house.

25   We know that.

1           They would say that he was a roommate, that

2    Mr. Stanley was starting, developing his relationship with

3    Ms. Austin, and that Mr. Hairston spent the majority of the

4    time at 173 Lionhead Court.  That evidence that was found

5    there is, I would submit, at least as likely, and in my

6    opinion more likely, to belong to the co-Defendant than it is

7    to my client.

8           Oh, I have it in my notes, Judge:  Dark skin,

9    approximately 40 years old.  Thick build, not fat, muscular.

10   He was strong.

11          That is how the victim describes the person who

12   sexually assaulted her.  And that is not Mr. Stanley.

13          So once we have talked about that, you know, you

14   look at his priors, first of all the Government mentioned an

15   arson charge, I believe pretrial confirmed at my request and

16   thanks to them for that, that that was my client's brother

17   that was charged.  My client's brother, another way to

18   describe it, likes to give alternate names when he gets

19   arrested, and at one point the name he could come up with was

20   his brother.

21          So pretrial has confirmed that.  Your Honor should

22   not in any way consider an arson charge because my client was

23   never charged.

24          THE COURT:  Well, looking at the facts here,

25   Mr. Proctor, I don't consider what the assailants did with a

1   blowtorch to be an arson anyway.

2              MR. PROCTOR:  No, I am talking about his prior

3   record.  The Government mentioned a prior record.

4              THE COURT:  I get that.  I saw that note so I

5   understand.

6              MR. PROCTOR:  Yes.  The escape, I get why that would

7   trouble someone like yourself in a decision to release.  My

8   client has maintained within 10 minutes of meeting him, that

9   wasn't me.  I have never been charged with escape.  We have,

10  we tried to get the fingerprints from the arrest.  It is too

11  old.  They are destroyed.

12             So right now I have a subpoena out to get the

13  mugshots.  I firmly believe Mr. Stanley has been candid with

14  me throughout, that when that comes back, he will not have

15  been the person charged with escape.

16             So I would submit that Your Honor not consider that

17  escape in any way.

18             And so if you rule those out, what have we got?  A

19  malicious destruction of property when he was 18 years of age

20  some 14 years ago?

21             Second-degree assault of Samantha Norwood.  You

22  know, they have since reconciled.  She has children with his

23  brother.  That doesn't show a dangerous propensity.

24             A 2020 theft.  That is not likely to move the ball

25  too much.  As the Government noted, the prior – right at the

1    end of that pretrial services report one of the reasons they

2    suggest he should remain incarcerated was active no bond

3    failure to appear warrant in Baltimore County.  That has since

4    been resolved.

5            And so --

6            THE COURT:  What about the seven protective orders

7    that are -- have been issued in the past and the fact that

8    there was a protective order issued the day of this first

9    victim's offense.

10           MR. PROCTOR:  Yes, Judge.  So let's take them in

11   some sort of an order.

12           First one was Samantha Norwood, who again as I

13   mentioned she is dating his brother nowadays.  That was 13

14   years ago in October 2009.  And he was 19 years old and they

15   were dating.

16           The second one was a Julie Freeland.  They were

17   never adjudicated and eventually dropped.  So that is how

18   stridently she felt about this man's propensity for danger.

19   She never followed through.

20           Sienna Thompson is his blood sister who was --

21   interfamily squabbles, that sort of thing.  They were having

22   fights and my client didn't appear because it was a family

23   fight.  Best left at that.  He didn't need to see her again

24   anyway.

25           Tawanna Brown, him and her share a 6-year-old

1  daughter together.  And she later, they got into an argument

2  and she did seek a protective order but she later asked the

3  court to dismiss it.

4          Which brings us to the last one, which while I

5  concede the timing could have been better, it is related to a

6  child custody battle that remains ongoing.

7          So it is not like he was threatening random members

8  of the community out on the street.  It is all inter-web

9  family dynamics.

10          So when you break it all down, Judge, where is he

11  going if he is on 24/7 electronic monitoring with a young lady

12  who holds a good job and has no connections with the criminal

13  justice system?

14          Where is he going?  Nowhere.  He is coming to my

15  office.  I will ensure he goes back there again.  He is coming

16  to court.  You will see him living and breathing.  And what

17  danger is he to the community if he is in that house, that

18  pretrial is promptly notified if he walks out without

19  permission.

20          Quite recently I happened to be with Mr. Stagg.  And

21  his phone was beeping like crazy because someone left, went to

22  the porch to smoke a cigarette and had gone too far away.

23          We are talking about real-time monitoring here.  I

24  don't see why he can't be released under the most strident of

25  conditions, given his, especially his tangential connection to

1    the crimes that are charged in the indictment.

2          It would be remiss of me not to mention his

3    grandmother Cathy is here.  Two friends of his, long-time

4    friends, Mr. James and Mr. Gilchrist.  Kirsten, who is the

5    third-party custodian, and her father.  Significant that her

6    dad came.  She is not going against the family wishes.  And

7    his stepbrother, Mr. Garland.

8          So for all those reasons we suggest -- I don't for a

9    moment quibble that the co-Defendants here who are using the

10   burner phones, I think there is one connection total with my

11   client and these proposed burner phones.

12          I don't quibble for a moment that they aren't

13   properly in jail because there are no conditions of release

14   that could satisfy the Court.  But at least as to my client

15   who is, even by the Government's estimation the low-hanging

16   fruit in all of this, I submit that the answer should be

17   different and he should be released.  Thank you, sir.

18          Can I just check with my client that he didn't want

19   me to say something that I omitted?

20          THE COURT:  Sure, Mr. Proctor.

21          (Pause.)

22          MR. PROCTOR:  No, Your Honor, my client just wanted

23   me to check, and I believe I have already covered it, that I

24   did mention the threat is in relation to a child custody

25   dispute.  The most recent protective order.  And I believe I

1    already covered that.

2            So with that, we would ask that he be released under

3    strident conditions that the Court fashions.  Thank you.

4            THE COURT:  Okay.  Thank you, Mr. Proctor.

5    Ms. Ticse, any response to that?  I am sure you have responses

6    to that.

7            MS. TICSE:  Thank you, Your Honor.  First going to

8    Mr. Proctor's suggestion that the evidence is tangential at

9    best, I just want to run through again, the location of the

10   Defendant's phone at certain times and his contact with other

11   Defendants' phones.

12           As to abduction Number 1, Mr. Proctor said the

13   Government confirmed that there was an auto-body shop nearby

14   that he worked at.  I don't believe that we have confirmed

15   that he worked at an auto-body shop nearby so in our

16   perspective, his location at the abduction site with other co-

17   Defendants two days before was consistent with preparation of

18   the abduction.

19           As to abduction Number 3, I don't remember exactly

20   what Mr. Proctor said but I will just note he was present in

21   the same area as the victim and other target telephones during

22   the abduction.

23           So at 3 am time, near a shopping center doesn't

24   really go far when the other burner phones and his co-

25   Defendants' phones are also in the same location, Your Honor.

1              And as to abduction Number 3, the Defendant's

2    personal phone with the burner phones and the victim's phone

3    at the same time in the middle of the night.

4              There is really no explanation for that, Your Honor.

5    And also just going back, I think it was abduction Number 2

6    where his phone was left at his co-Defendant Mr. Smith's

7    residence.  That is not where Mr. Stanley grew up.

8    Mr. Smith's residence is on Cherrydale Avenue.

9              He grew up with Mr. Smith but his phone was not left

10   where he grew up.  So I don't think it is fair to say that the

11   evidence regarding the phone location is tangential at best.

12             But what is really important here is the evidence

13   that was seized from the Defendant's residence.  Mr. Proctor

14   said that the Government's witness said that Mr. Stanley was

15   staying elsewhere, and that Mr. Hairston was staying at

16   Mr. Stanley's Lionhead address.

17             That witness that they are referring to is

18   Mr. Stanley's girlfriend, who had told us that he was staying

19   with her most of the time.  But I will note that I expected

20   this argument, and we noted that there were 831 contacts

21   between Mr. Stanley's personal phone from May 1st, 2021,

22   through October 30th, 2021, at the Lionhead address.

23             So yes, he may have been going back to Ms. Austin's

24   house to sleep here and there, but he was going to that

25   Lionhead address where this evidence was recovered.

1          But even more importantly, is that we know for a

2     fact because of surveillance that Mr. Stanley was residing at

3     that address when it was searched in January.  And when the

4     police vest and the blue blowtorch were seized from that

5     residence.

6          Mr. Hairston had been locked up since August.  So

7     there is no more pointing the finger at Mr. Hairston, who was

8     locked away when Mr. Stanley is living at that address, making

9     contacts with cell towers at that address, and is there, using

10    that roof over his head, when all of this evidence is seized

11    from his home.

12         And in regard to flight:  Pretend there is no escape

13    charge.  Pretend there is no FTAs.  Mr. Stanley was on the run

14    for four months in this case.  Left work the day his house was

15    searched, right when his house was being searched.  Shut his

16    phone off.  Went somewhere else and hid out for four months

17    until he was located.

18         Even if he didn't have any prior flight risk he

19    certainly does now.  And going to the criminal history, the

20    malicious burning charge on the pretrial report was

21    established to be his brother.  There is still a charge for

22    arson, and I understand the Court is not taking that into

23    consideration here, as far as the blowtorch being arson but

24    there is a September 25th, 2018, charge for arson and threat,

25    though the disposition is unknown.

1           And there are still 7 protective orders by 7

2    different people, even if Mr. Stanley has an explanation as to

3    why the Court shouldn't consider them.  They are certainly

4    still there, and the Court has previously found that there was

5    enough to issue some sort of protection for these individuals.

6           And Mr. Proctor also noted that Ms. Austin is as

7    good as a third-party custodian can get.  I would beg to

8    differ with that based on the fact that we know that she was

9    helping Mr. Stanley hide out for the four months he was on the

10   run.

11          She may not have any criminal history but certainly

12   she was instructed to contact law enforcement if she came in

13   contact with Mr. Stanley during that time.

14          Your Honor, he ran and didn't show up for Baltimore

15   County.  And ran from these charges when he was facing Howard

16   County charges for just one abduction.  He is now facing for

17   three abductions and facing up to life in prison.

18          So Your Honor, the Defendant is a dangerous man that

19   we do not believe can overcome his presumption.  Thank you.

20          THE COURT:  Okay.  Thank you.  In accordance with 18

21   United States Code Section 4142, a detention hearing has been

22   held, and I have determined after hearing the evidence in this

23   case, and I will go into some detail with the factors, that

24   this statute requires the detention of the Defendant pending

25   his trial.

1          And by clear and convincing evidence I believe that

2    that is the case.  And I certainly appreciate Mr. Proctor's

3    arguments.  Some of them may be arguments for a later day.

4    Some of them relate to the detention hearing.  But let me just

5    review the factors here.

6          Let me just also say that normally a person who is

7    not a threat to the community does not have seven separate

8    incidents of protective orders filed against them.  That

9    doesn't even count in terms of his criminal history.

10          So under Section G, the factors to be considered:

11    The nature and circumstances of the offense charged.  These

12    were not simple carjackings.  These were not simple robberies.

13    These were malicious and violent offenses against the victims.

14          I can't imagine what the victims in these cases were

15    feeling during the events that occurred for each of them.

16    Certainly to be bound, to be gagged, and to be tortured, goes

17    above and beyond a simple violent carjacking.

18          So the nature and circumstance of the offense here

19    are very serious, and they are crimes of violence, and as I

20    said, that goes beyond even the normal horrific violence we

21    see here in this courthouse.

22          The weight of the evidence against the person: I

23    understand the arguments that Mr. Proctor is making, and I do

24    think he makes them very well and very eloquently.

25          Unfortunately, I am not convinced by any of those

1    arguments because I believe that the relation to the phones in

2    terms of the location of the Defendant -- the Defendant would

3    have to be so unlucky to have his phone always at the wrong

4    place, always at the wrong time, always with the phones of the

5    co-Defendants.

6            And there is plenty of activity between those phones

7    during and in preparation for the three abductions that we

8    have heard about today.

9            I find the weight of the evidence here is extremely

10   strong against the Defendant.  And then you turn to the search

11   warrant.  So you have got the phone evidence coupled with the

12   search warrant that yields the tools that were used for these

13   abductions.

14           And he may be able to argue at trial that he was not

15   the one at the residence when these items were there, but

16   Mr. Hairston was already incarcerated at the time if I am

17   correct about what I have heard.

18           So at the time of the search warrant itself.  But

19   that is for another day.

20           Today I accept the Government's proffer that the

21   evidence that is there is consistent with the evidence in the

22   other search warrant, which yielded similar evidence of

23   blowtorch, the police vest, that were used in these offenses

24   along with zip ties and so forth, a toolkit for the horrendous

25   acts.

1              Also I find that another issue about the particular

2    weight of the evidence here is a 9-millimeter handgun was

3    recovered where he was staying when he was on the run, and

4    there was 9-millimeter ammunition recovered from his

5    residence.

6              And I am not saying that there is only one box of 9-

7    millimeter ammunition and one 9-millimeter handgun in the

8    state of Maryland.  I am saying that is just another incident

9    that ties those together as well.

10             So I find the weight of the evidence commands the

11   detention of the Defendant.  History and characteristics of

12   the person: As much as -- even if you accept that his brother

13   used his name on one of his arrests, everything about his

14   history shows that he is a danger to the public.

15             And all of the offenses here fairly represent that

16   danger.

17             So I find that the issuing characteristics of the

18   person with his prior criminal history commands the detention

19   of the Defendant.

20             And I will also remark again about the fact that

21   there were seven separate protective orders that were filed

22   against the Defendant.

23             He can explain those, and Mr. -- I think Mr. Proctor

24   explained them very well.  But they are there, and I accept

25   them as they are.  So there may be explanations for them, but

1   certainly that is not a normal activity of an adult in the

2   state of Maryland to have seven separate protective orders

3   filed against them.  So I consider that as well.

4         The nature and seriousness of the danger to any

5   person in the community: These are horrific acts.  We see, as

6   I said, we see carjackings, robberies, even attempted murders

7   during these as being, you know, extremely violent crimes that

8   pass through the doors of this courthouse.

9         But these particular offenses really stand out

10  because they involve actual torture of the victims.

11        So the nature and seriousness of the danger to any

12  person that he poses, by clear and convincing evidence, is a

13  threat to the public.

14        I also have absolutely no confidence that the

15  Defendant would not flee, the Defendant would appear for

16  trial.  I think he has very good counsel who would do

17  everything they could to try to keep him in line, but I have

18  no confidence based on his history.  And also the fact that he

19  knew that he was being sought during the time period when he

20  was on the run.

21        And therefore I find by preponderance of the

22  evidence that he is also a risk of flight.

23        So those are my findings, and I will enter an order

24  accordingly.  Ms. Ticse, is there anything else we need to

25  address?

1                MS. TICSE:  I don't believe so, Your Honor.  Thank

2    you.

3                THE COURT:  And Mr. Proctor, anything else we need

4    to --

5                MR. PROCTOR:  Your Honor, if I could inquire of

6    Madam Clerk.  I don't remember if we were arraigned when we

7    were initially here?

8                THE CLERK:  Yes, there was an arraignment on May

9    2nd, 2022.

10                MR. PROCTOR:  Nothing else, then.  Thank you, sir.

11                THE COURT:  All right.  All right, we will stand in

12    recess after this matter.

13                MS. TICSE:  Thank you, Your Honor.

14                THE CLERK:  All rise.  This honorable Court now

15    stands in recess.

16                (Whereupon, the hearing concluded at 2:26 p.m.)

17

18

19

20

21

22

23

24

25

lcj                                                                                    32

<u>C E R T I F I C A T E</u>

I certify that the foregoing is a correct transcript from the

duplicated electronic sound recording of the proceedings in

the above-entitled matter.

*Laura C. Jackson*   09-15-22
_____
Laura C. Jackson                    Date
Transcriber