**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.  BAH-22-140-02** |
| **DONTE DAVON STANLEY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM IN SUPPORT OF A SENTENCE OF 35 YEARS' IMPRISONMENT FOR DONTE DAVON STANLEY

Donte Davon Stanley was convicted for his role in carrying out a shockingly violent abduction.  After impersonating law enforcement and kidnapping victim A.T. at gunpoint, Stanley, together with his co-defendant Dennis Hairston and others, bound and masked A.T. and forced her into the rear of their car.  Stanley drove A.T. around for hours as Hairston repeatedly beat A.T., sexually assaulted her, and used a blow torch to burn and torture her.  A.T. is permanently scarred and disfigured, and the psychological damage is similarly irreparable.

The shocking violence inflicted on A.T. was not an unexpected turn of events that Stanley observed and then was powerless to flee.  Instead, A.T.'s torture was *part of the plan* that Stanley agreed to and helped effect.  And then Stanley actively participated in the crimes *for five hours*. Following this truly horrific crime, Stanley remained Hairston's all-too-willing right-hand man; he participated in other criminal activity with Hairston, destroyed evidence for Hairston, and even planned to commit additional abductions with the kidnapping gear while Hairston was incarcerated.

For these reasons and those discussed more fully below, Donte Stanley should be sentenced to 35 years' imprisonment.

1

## I.     PROCEDURAL BACKGROUND

On April 4, 2022, Stanley was named in a twelve-count indictment charging him with various offenses arising out of three particularly violent armed abductions.  Following a three-week jury trial in May and June 2024, the jury found the defendant guilty of the offenses relating to the first abduction.  As to the first abduction, the jury convicted the defendant of kidnapping conspiracy (Count 1), conspiracy to affect commerce by robbery (Count 2), kidnapping (Count 3), and carjacking (Count 4).  The jury acquitted the defendant of all counts relating to the second and third abduction (Counts 5 through 12).

The sentencing hearing on this matter is scheduled for November 19, 2025.  United States Probation Officer Nicole Wonneman prepared the Presentence Report (ECF 282), which provides for a final offense level of 43, a criminal history category II, and an advisory guidelines of life imprisonment.  The government agrees with the final guideline calculation in the Pre-Sentence Report (PSR).

## II.     FACTUAL BACKGROUND

The facts in this case are deeply disturbing and reflect the clear and ongoing danger that the defendant poses to the public.  The following facts were established at trial, and are reflected in the PSR at paragraphs 6 through 50:

Stanley was convicted for his role as an eager participant in a conspiracy to kidnap and torture A.T.  Codefendant Franklin Smith testified that Hairston developed a violent plot to surveil, kidnap, and rob victims—a plot that Stanley was only too willing to help execute.  Hairston recruited Stanley and others, selected the victims, devised the plan including to impersonate law enforcement, and procured the kidnapping materials (vests, radios, badges, zip ties, duct tape, firearms, and gun holsters).  As part of the scheme, Stanley helped take sophisticated steps to avoid

detection.  He used "burner" phones—cheap, prepaid cell phones with no contractual commitments—in planning and carrying out the kidnappings, as Hairston intended.  Cell site location records showed that the defendants did indeed use the burner phones in carrying out the kidnappings, and also showed that the burner phones linked back to addresses associated with the defendants.

### a.   May 5-6, 2021, Kidnapping of A.T.

The evidence at trial established that on May 5, 2021, shortly after 8 p.m., Hairston and Stanley kidnapped victim A.T. just minutes away from the Check Cash Depot where A.T. worked. The defendants held A.T. for hours, during which time they interrogated her at length.  Stanley drove the vehicle in which A.T. was being held, while Hairston sexually assaulted A.T. and beat her and burned her with a blowtorch so severely that she has injuries from which she has not recovered more than three years later.

The defendants had identified A.T. as an eventual victim and had been surveilling her for some time.  Franklin Smith testified that the defendants had identified A.T. as an eventual victim because her job afforded her access to large amounts of cash.  The defendants affixed a GPS tracking device on A.T.'s vehicle to track her movements.  Smith also testified that his co-defendants had surveilled A.T. at the Check Cash Depot where she worked.  Consistent with Smith's testimony, A.T. testified that while the defendants were holding her, they made statements revealing that they were familiar with A.T.'s work schedule and residence—information that they could have known only if they had been watching her.  They also surveilled her the day before the kidnapping; cell site location information for Stanley's and Hairston's personal phones placed them in the vicinity of the Check Cash Depot approximately 24 hours before the kidnapping, indicating that the defendants were casing the area.

On the afternoon of May 5, 2021, in the hours before the defendants kidnapped A.T., Hairston, Stanley, and Smith communicated by text in a three-way group chat. The evidence at trial established that although the defendants attempted to keep their communications vague, they were coordinating the intended kidnapping of A.T. By text, Smith stressed the need to "communicate"; Smith sent a photo of the Ford Fusion that would be used to carry out the kidnapping; and all three men sent messages coordinating a meeting. Smith and Stanley were driving together, as reflected in messages between Smith and his then-girlfriend, Shana Bazemore.

Smith testified that he met up with Hairston and Stanley near the Check Cash Depot in Baltimore, Maryland. Hairston and Stanley were in Bazemore's white Ford Fusion, with Stanley driving. Hairston told Smith the plan: Hairston and Stanley would follow A.T. as she left work, and messaged Smith that A.T. was heading in his direction, and Smith, dressed in an orange construction vest, would divert A.T. onto a quieter street to avoid witnesses.

Around 8 p.m., A.T. left her job at the Check Cash Depot and drove her normal route heading home. After driving just a few blocks, A.T. testified that she was diverted off a main road onto a more secluded street by apparent construction work. A white Ford Fusion with a siren and police-style lights pulled A.T. over. Hairston and Stanley got out of the Fusion and approached A.T.'s vehicle, posing as law enforcement officers. They wore masks and were dressed in police-style tactical vests with the word "police" written on them. They also wore police badges and carried and brandished firearms to remove A.T. from her vehicle. They handcuffed A.T.'s hands behind her back and forced her into the rear of the Fusion. Once inside, A.T.'s feet were zip-tied, and she was blindfolded with a mask that was secured by duct tape around her face. A.T. testified that during the kidnapping, the defendants stole her keys (including the keys to the Check Cash Depot), her wallet, phone, and paperwork relating to the Check Cash Depot.

4

Smith testified that he watched Hairston and Stanley abduct A.T. and then returned to his home at 175 Cherrydell Road in Catonsville, Maryland.

Smith observed Hairston and Stanley abduct A.T. on the side street and testified that after A.T. was forced into the Fusion, Stanley drove while Hairston rode in the rear of the vehicle. Both defendants interrogated A.T., demanding to know details about the cash kept in safes at Check Cash Depot and how to access the safes. A.T. was unable to provide details to the defendants' satisfaction. Hairston repeatedly beat A.T. during the questioning while Stanley continued to drive the vehicle. Hairston told A.T. at one point, in sum and substance, that if A.T. was not going to talk, he was going to "play with fire." Hairston removed A.T.'s pants and underwear, ripped her shirt and bra, and sexually assaulted her by touching her breast and her legs, including her inner thigh. While demanding information from A.T. Hairston produced a blow torch and used it to burn A.T.'s chest, stomach, leg, and breast, leaving injuries that have still not healed. A.T. testified that the pain was so intense, she repeatedly blacked out. Hairston then beat and burned A.T. to rouse her so he could resume his interrogation.

A.T.'s description of her assailant (the shorter, stockier of the two mean) confirmed that it was Hairston who repeatedly beat, sexually assaulted, and burned her. Additionally, Smith testified that he drove Stanley home after the kidnapping, during which time Stanley said that Hairston burned A.T.

Stanley drove A.T. around for hours, during which time the defendants made several stops and continued to interrogate A.T. A.T. remained handcuffed and blindfolded throughout. At one point, the defendants stopped the Fusion at Smith's home at 175 Cherrydell Road. Cell site location data confirmed that around approximately 12:30 a.m. on May 6, 2021, Hairston, Stanley, Smith, and the burner phones used in the crime were all at the Cherrydell residence. Smith testified

that when Hairston and Stanley came to his residence, he learned that two other men, whom he knew only by the nicknames "Boosie" and "GoHard" were also involved in the kidnapping.

When the Ford Fusion was parked at the Cherrydell residence, Smith received a text to go into the alley, where he observed the Fusion with A.T. handcuffed in the rear of the Fusion. Smith entered the Fusion and observed that A.T. was burned and partially undressed, and further testified that he could smell the scent of burned flesh. Smith testified that he helped A.T. put her clothes on and gave her some water. Smith also testified that A.T. begged him to not let "them"—referring to Hairston and Stanley—burn her again.

Smith's then-girlfriend, Shana Bazemore, also testified that she owned the white Ford Fusion used in A.T.'s kidnapping, and that Smith and Hairston used the car with and without her permission. Bazemore also witnessed portions of the kidnapping, although, she testified, she did not appreciate what was happening. Text messages show that Bazemore and Smith were texting throughout the evening of May 5-6, 2021. When Smith was in the car with A.T., he texted Bazemore asking her to bring him a beer because the woman in the car—A.T.—was "getting on his nerves." Bazemore testified that she brought Smith a beer as requested. As she approached the Ford Fusion, she encountered Hairston, who attempted to stop Bazemore from approaching the car. Bazemore pushed past Hairston to deliver the beer to Smith, and testified that she saw a woman in the rear of the car. Bazemore also testified that when she next used the Ford Fusion a few days later, she smelled bleach and discovered a receipt or pay stub from a check cashing store. Bazemore testified that Smith and Hairston both told her that the bleach smell was their attempt to clean up from Hairston having sex in the car with a woman from a check cashing business.

Smith testified that after Bazemore delivered the beer, Hairston, Stanley, Smith, Boosie, and GoHard arrived in the alley and the group of men moved A.T. from the Fusion back into her

Jeep. A.T. testified that one of the individuals demanded her name and typed it in a note in a cell phone. The men told A.T. that they were corrupt police and so A.T. should not bother calling the police. A.T. was driven in the Fusion to Braeside Road, where the men removed her from the Fusion and placed her face down on the floorboard of her own vehicle, which had also been driven from near the Check Cash Depot to Braeside Road. The conspirators, including Hairston and Stanley, covered A.T.'s Jeep Compass with a tarp and secured the tarp with bungee cords. The defendants all but left A.T. for dead: They left her extensively burned, still handcuffed, blindfolded and face down on the rear floorboard of the covered vehicle. Approximately five hours after she was first abducted, sometime after 3 a.m. on May 16, 2021, A.T. forced her way out of her vehicle and ran to a nearby residence where she pleaded for help. Officers and medics responded. A.T. was treated in a hospital for her injuries, but she testified that her burn injuries have not fully healed.

### b. May 15-16, 2021, Kidnapping of J.H. (Counts 7-9)

Ten days later, victim J.H. was kidnapped. As with the first victim, J.H. was held for hours, during which time he was interrogated, robbed of a necklace that cost thousands of dollars, and burned him with a blowtorch. The evidence established that, as with A.T., J.H. was surveilled before his kidnapping on May 15, 2021. In 2024, investigators discovered that a GPS tracking device had been affixed to the underside of J.H.'s car. The jury heard evidence that the tracking device was identical to a tracking device discovered at Stanley's residence in January 2022— except that the device found under J.H.'s car in 2024 was weathered and rusted, indicating it had been there for an extended period.

The jury convicted codefendant Hairston of charges relating to J.H.'s kidnapping, but acquitted Stanley of those same charges. The Sentencing Guidelines prohibit the Court from

considering acquitted conduct in determining sentencing guidelines computations, *see* U.S.S.G. §1B1.3(c), although the Court is not prohibited from considering acquitted conduct overall when determining the appropriate sentence under 18 U.S.C. § 3661. For the avoidance of doubt, the government does not ask that the Court's sentence consider conduct for which the defendant was acquitted.

### c. The Kidnapping of A.K. on August 2, 2021 (Counts 10-12)

The jury also heard testimony from a third victim, A.K., about her kidnapping on August 2, 2021. A.K. testified that she worked at ACE Cash Express, a check cashing business, and that she was held for hours, during which she was interrogated for information the kidnappers could use to get cash from the ACE Cash Express. The jury also heard testimony that the kidnappers wore police-style vests with "police" written on them., that they kidnapped A.K. at gunpoint, and that A.K. observed a blowtorch and bottle of bleach in the vehicle in which she was held.

The jury acquitted Stanley in connection with charges relating to A.K.'s kidnapping. As with the conduct related to the kidnapping of J.H., the government does not ask that the Court's sentence consider conduct for which the defendant was acquitted.

### d. August 26, 2021, Attempted Burglary of US Fuel

On August 26, 2021, Hairston and co-defendant Dorsey were arrested fleeing the scene of an attempted burglary in Baltimore County. Stanley was not observed or arrested in connection with that attempted burglary, but the evidence at trial showed that Stanley was nevertheless involved. Specifically, the evidence showed that Stanley called 911 to falsely report a carjacking in the early morning hours when the attempted burglary was taking place.

At approximately 3:23 a.m., the owner of a garage connected to a US Fuel gas station called 911 to report a burglary in progress. Responding officers testified that they observed activity in

the trees behind the garage and saw Hairston and Dorsey run from the trees. Hairston and Dorsey jumped the chain link fence behind the garage and ran along railroad tracks.

As Hairston and Dorsey fled, another officer arrived on the scene and saw them running across the street away from the US Fuel and towards a residential area. He ordered the two men to stop. Both men continued to flee, but Hairston was unable to continue running and abruptly stopped. The officer recovered a set of keys and two burner cell phones from Hairston's pockets. Both phones were used in the prior kidnappings. When both Hairston and Dorsey were in custody, an officer returned to the trees behind the US Fuel where the two men had been hiding earlier. They located a hammer, prybar, and sledgehammer. They also located a third burner cell phone that was also used in the prior kidnappings. A witness testified that Hairston texted her from two of the phones during May and June 2021, proving that Hairston used the burner phones from the kidnappings for personal use around the time of the kidnappings.

As stated, law enforcement officers did not see Stanley that night. However, the jury heard a recording of a bogus 911 call that was placed in the early morning hours, around the time of the attempted burglary, in which the caller falsely reported a carjacking. No such carjacking occurred—the call was a diversion intended to lead officers away from the location of the US Fuel. The evidence shows that Stanley made this diversionary phone call, intending to help Hairston and Dorsey flee the police. The call was placed by one of the burner phones involved in the kidnapping conspiracy, identified at trial as Target Telephone 12. Target Telephone 12 was purchased at a Walmart on August 1, 2021, one day before A.K.'s kidnapping. Cell site location analysis revealed that the top cell tower for Target Telephone 12—that is, the tower the phone most often pinged, and the location where the phone spent most of its time—was right next to a home on Allendale Street, Baltimore, where Stanley's girlfriend, Kirsten Alston, lived, and where Stanley spent

significant time.  In fact, the top cell tower for Target Telephone 12 was *identical* to the top cell tower for Stanley's personal phone.  This evidence shows that almost four months after A.T.'s kidnapping, Stanley was continuing to work with Hairston to rob and burgle others.

Further, in the fall of 2021, while in custody in connection with the US Fuel attempted burglary, Hairston directed his conspirators to move and destroy evidence.  In a recorded jail call, Hairston contacted Stanley to instruct Stanley to destroy or remove evidence.  A few days later, Stanley told Hairston he had done so.

> **e.  Transfer of Kidnapping Gear from Stanley to Dorsey and January 6, 2022, Search Warrants**

The evidence also established that Stanley wanted to put the kidnapping gear to further use as late as the fall of 2021, five months after A.T.'s kidnapping.  Recorded jail calls showed that in October and November of 2021, Hairston, Stanley and others discussed the bag that contained their kidnapping gear, including police vests, handcuffs, police-style flashing lights, badges, and other similar items.  During these calls, Hairston and Stanley discussed that Stanley was in possession of the bag containing the kidnapping gear and that Stanley planned to use the gear to make money.  In one call, made on October 23, 2021, Stanley stated that he had "**something lined up for tonight and I was gonna use that**," referring to the bag.  Hairston stated he did not want the contents of the bag to be "collecting dust."  Stanley reiterated that was "**definitely will keep it.  I'm definitely still working with it**."

When Hairston ordered that the kidnapping gear be transferred to Davonne Dorsey, Stanley resisted, stating "I just don't want to give it to [Dorsey] though.  He's not fucking smart."  Even after Hairston arranged for an acquaintance to transfer the kidnapping gear from Stanley to Dorsey, Stanley continued to try to hold on to the gear.  On November 9, 2021, in the midst of a series of recorded calls about the bag containing the gear, Dorsey repeatedly texted Stanley demanding the

bag. Stanley ignored those texts, eventually saying "Fed phone not right." Despite Stanley's repeated efforts to keep the kidnapping gear and his promises to use it, the evidence established that, at Hairston's instruction, another individual acted as a go-between and delivered the bag from Stanley to Dorsey.

On January 6, 2022, officers conducted search warrants at various addresses, including Dorsey's home. The bag that was the subject of discussion among Hairston, Stanley, and Dorsey was found in a closet at Dorsey's residence. The bag contained two police vests, police-style radios, gun holsters, police badges, duct tape, and police-style light badges. Subsequent forensic testing showed that several of the items had Dorsey's and Stanley's DNA on them. With respect to Stanley, his DNA was found on two of the police badges, both police vests, and a gun holster. Additionally, officers executing a search warrant at Stanley's residence found a third police vest, which also had Stanley's DNA on it. Officers also found a GPS tracker at Stanley's residence, and the tracker was virtually identical to the tracker that would be found on the underside of victim J.H.'s car years later.

### f. January 6, 2022: Stanley's Flight and the Destruction of Evidence

Following the execution of search warrants on January 6, 2022, Stanley immediately went on the run as Hairston ordered the destruction of evidence. A supervisor from his employer testified that Stanley was scheduled to work on January 6 and clocked in in the early morning, before the warrant was executed. Shortly after the warrant was executed, Stanley left work without a word to anyone, and never returned. A state warrant for Stanley's arrest was issued, but Stanley remained on the run for months. In a recorded jail call, Hairston also advised Stanley to "stop using his phone."

Law enforcement witnesses testified that Stanley was not found until April 7, 2021. Investigators tracked Stanley's new phone to an apartment building in Baltimore City.  Stanley was arrested as he exited the apartment building and entered a car driven by his friend.  During the search of the apartment at which Stanley had been staying, investigators found mail addressed to Stanley, as well as a loaded semi-automatic handgun with Stanley's DNA on it.

### g.  Trial

Hairston and Stanley's Coordinated Attempt to Avoid Trial:

In a coordinated effort, both defendants attempted to avoid coming to court on the first day of trial.  The trial was scheduled to begin on May 13, 2024.  The evening before trial, Stanley attempted to make himself unavailable by causing a self-inflicted medical emergency. Specifically, he removed a port from an ostomy bag, which resulted in his hospitalization.  Hairston also attempted to disrupt by trial by refusing to leave his cell on to go to court on the morning of May 13.  Ultimately, Stanley was discharged from the hospital on May 13 and was produced for trial, and Hairston appeared in court without having to be extracted from his cell.

## III.  **SENTENCING CALCULATION**

### a.  **Statutory Maximum Sentences**

The maximum sentences that may be imposed for the counts of conviction are as follows:

    i.  Count 1:  Kidnapping Conspiracy, 18 U.S.C. § 1201(c):

- Life imprisonment

    ii.  Count 2:  Conspiracy to Affect Commerce by Robbery, 18 U.S.C. § 1951(a):

- 20 years' imprisonment

    iii.  Count 3:  Kidnapping, 18 U.S.C. § 1201(a):

- Life imprisonment

iv.  Count 4:  Carjacking, 18 U.S.C. § 2119:

- 15 years' imprisonment

**b.  <u>Offense Level Computation</u>**

The defendant's violent criminal conduct that makes up the instant offenses results in two

separate groups that compute to an offense score of 49, as described here:

<u>Group 1:  Conspiracy and May 5, 2021, Kidnapping of Victim A.T. (Counts 1-6)</u>

<u>Kidnapping Conspiracy and Kidnapping (Count 1 and Count 3):</u>

a.  Pursuant to U.S.S.G. §2A4.1, the base offense level is **32**.
b.  Pursuant to U.S.S.G. §2A4.1(b)(2)(A), **4** levels are added because the victim sustained a permanent or life-threatening injury.
c.  Pursuant to U.S.S.G. §2A4.1(b)(3), **2** levels are added because a dangerous weapon was used.
d.  Pursuant to U.S.S.G. §2A4.1(b)(5), **6** levels are added because the victim was sexually exploited.
e.  Therefore, the anticipated adjusted offense level is **44**.

<u>Conspiracy to Commit Hobbs Act Robbery, Carjacking, Hobbs Act Robbery (2B3.1) (Count 2, Count 4, Count 5):</u>

a.  Pursuant to U.S.S.G. §2B3.1(a), the base offense level is **20**.
b.  Pursuant to U.S.S.G. §2B3.1(b)(2)(C), **5** levels are added because a firearm was brandished or possessed.
c.  Pursuant to U.S.S.G. §2B3.1(b)(3)(C), **6** levels are added because the victim sustained permanent or life-threatening injury.
d.  Pursuant to U.S.S.G. §2B3.1(b)(4)(A), **4** levels are added because any person was abducted to facilitate the offense.
e.  Pursuant to U.S.S.G. §2B3.1(b)(5), **2** levels are added because the offense involved carjacking.
f.  Therefore, the anticipated adjusted offense level is **37**.

<u>Sexual Exploitation Enhancement:</u>

Stanley objects to the 6-level enhancement, pursuant to U.S.S.G. §2A4.1(b)(5), which

applies because the victim was sexually exploited during the course of the kidnapping.  He argues

that the enhancement does not apply because the sexual assault was neither reasonably foreseeable

nor in furtherance of the criminal activity.  Thus, Stanley contends, the conduct does not constitute "relevant conduct" under U.S.S.G. §1B1.3(a)(1)(B).  That argument fails.

First, Stanley is responsible for A.T.'s sexual exploitation under §1B1.3(a)(1)(**A**) as an aider and abettor.  That provision provides for enhancements for all "acts and omissions committed, aided, [and] abetted," regardless of whether the acts were in furtherance of the kidnapping conspiracy or reasonably foreseeable.  The evidence establishes that Stanley aided and abetted Hairston's sexual exploitation of A.T.  Hairston and Stanley were actively interrogating A.T. when Hairston began his sexual exploitation of A.T., and that exploitation was just another method to try and elicit information from A.T.  As Hairston commenced his exploitation (just as he commenced his burning), Stanley drove the vehicle in which A.T. was trapped.  That affirmative act was a significant contribution to Hairston's conduct.  Driving the car helped ensure that Hairston and Stanley remained on the move and avoided detection from passersby or law enforcement.  In that way, his role can be analogized to that of a getaway driver—a canonical example of aiding and abetting.  *See* U.S.S.G. §1B1.3 cmt. 4(B)(i); *United States v. Sears*, 734 F. App'x 685, 688 (11th Cir. 2018) (unpublished) (collecting cases and explaining that "driving the getaway car is the quintessential case of aiding and abetting a crime").  Driving the car while Hairston exploited A.T. also ensured that she could not escape.  Even if she managed to slip free, it would be virtually impossible to flee a moving vehicle, and if A.T. did exit the vehicle, she would be on foot and could not possibly get away from her assailants in a car.  Stanley might as well have been pinning down A.T. while Hairston burned and sexually exploited her, because the effect—making it harder for A.T. to flee—was the same.

Second, the enhancement applies because A.T.'s exploitation was reasonably foreseeable under §1B1.3(a)(1)(**B**).  When Stanley and Hairston set out to kidnap A.T., they brought lethal

weapons (firearms and a blowtorch) and restraints, all of which they had procured specifically for these crimes.  Stanley's active participation in the planning and carrying out of these vicious acts shows that he was ready and willing to abuse A.T.'s person by any means necessary to elicit information.  The inclusion of the blowtorch reflects an intent to use even particularly sadistic torturous methods of interrogation.  And ultimately, the sexual exploitation of A.T. occurred at the same time as the burning and was another tool in the interrogation toolkit.  Notably, A.T. was not sexually assaulted when the crime was complete, or when they stopped the car in the alley behind Franklin Smith's home.  She was sexually assaulted during the interrogation, in the midst of the other forms of torture, all with the same goal: to scare, shame and torture A.T. into complying with Hairston's and Stanley's demands.  As the First Circuit very recently explained, sexual exploitation can occur even if the exploitation is not "sexually motivated."  *United States v. Otero*, -- F.4th --, 2025 WL 2673578, at *6 (1st Cir. Sept. 18, 2025).  Rather, the enhancement can apply if the sexual exploitation was done "with the intent to abuse, humiliate, harass, or degrade [a] victim" or "punish[]" the victim.  *Id*.  The evidence established that Hairston sexually exploited A.T. for precisely those reasons—to abuse, humiliate, and punish her for her lack of cooperation —and the evidence also established that Stanley was fully aware that the plan, in advance, was to abuse, humiliate and punish A.T. if she did not cooperate.  Thus, it was reasonably foreseeable to Stanley that Hairston would act in the sadistic manner he did.

<u>Obstruction Enhancement:</u>

Pursuant to U.S.S.G. §3C1.1, **2** levels are added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct;

or (B) a closely related offense was an organize or leader of a criminal activity that involved five or more participants. Thus, the anticipated adjusted offense level for Stanley is **46**.

Stanley's obstructive conduct included destroying evidence at Hairston's direction following Hairston's arrest for the U.S. Fuel burglary and concealing his personal phone during his flight from arrest in January 2022. The burglary involved the same conspirators (Hairston, Dorsey and Stanley), and significant evidence relating to the instant offenses was found during the arrests. Thus, the evidence Stanley destroyed or concealed Hairston's direction was likely additional evidence that would have connected the conspirators to the violent abductions.

Other obstructive conduct committed by Stanley that does not fit under U.S.S.G. §3C1.1 includes his placing a diversionary call during the U.S. Fuel burglary, and his months long flight from arrest starting on January 6, 2022. Although the commentary lists conduct including flight from prosecution as an example of conduct not ordinarily covered by the enhancement, the commentary also notes that this type of conduct "may warrant a greater sentence." *See* U.S.S.G. §3C1.1 cmt. 5.

### c.    Criminal History

Although Stanley has only two criminal history points (ECF 282, ¶ 95), that understates his extensive and disturbing criminal history. Stanley has *eleven* arrests as an adult, between 2008, when he was 18 years old, and 2020, when he was 30. He has criminal convictions for malicious destruction, violent domestic assault, and numerous dangerous driving infractions where he taunted and eluded law enforcement. He has been convicted of violating his probation on three separate occasions. Instead of maturing as he has gotten older, Stanley has shown ever-increasing antisocial behavior, which he has demonstrated though his lack of respect for the criminal justice system, law enforcement, and human life. Although the defendant's guidelines will be life

regardless of his criminal history, Category II far underrepresents the defendant's Criminal History.

**IV.    SENTENCING RECOMMENDATION**

Stanley was an eager participant in a disturbingly violent and premeditated abduction. While Dennis Hairston developed the plot to kidnap and torture innocent victims, Stanley was there every step of the way, willingly executing on Hairston's vision. He helped surveil A.T. in the period before her abduction. He used burner phones to ensure he and his coconspirators would get away with their misdeeds. He abducted A.T. at gunpoint, along with Hairston. Stanley helped interrogate A.T. in an effort to steal cash from her employer. For hours, Stanley drove Hairston and A.T. As Hairston beat A.T., Stanley continued to help. As Hairston sexually assaulted A.T., Stanley continued to help. As Hairston tortured A.T., Stanley continued to help. Even as the car Stanley drove filled with the smell of burning human flesh, Stanley continued to act as Hairston's right-hand man.

After this horrific crime, the evidence showed that Stanley continued to act as Hairston's willing collaborator. He placed a diversionary 911 call on the night of the US Fuel attempted burglary, and he moved swiftly to destroy evidence when instructed by Hairston to do so. And Stanley also made every effort to hold onto a bag of kidnapping gear, insisting he was planning to put that gear to use. In his own words, during October of 2021, Stanley planned to commit another abduction, with guns, police gear, handcuffs, duct tape, and radio—and with a blow torch.

The violent and disturbing conduct in the instant offense shows the worst of human nature. Stanley participated in the planning and execution of a devious plot to kidnap and torture an innocent victim, and he took extensive steps (including relying on a network of burner phones) to ensure he could never be caught for his misdeeds. The harm and impact to A.T. was part of the

plan, and Stanley was part of the planning.  The violence is this case, which the defendant knowingly and willfully helped cause, is simply shocking and horrific.  The defendant's commission of this horrific crimes after an adult life riddled with arrests including violence and violations of court ordered supervision.  The defendant's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), demands a sentence of 35 years.

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.' 18 U.S.C. § 3553(a)(4)(A)." Regarding sentencing, the Supreme Court states, "the Guidelines should be the starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines are the "natural starting point from which the sentencing court exercises its discretion under § 3553(a).  *United States v. Langford*, 516 F.3d 205, 212 (3d Cir.2008).  This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter."  *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner.  18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated

defendants for to avoid sentence disparities.    18 U.S.C. § 3553(a)(6).    Consideration of these factors necessitates a significant sentence.

### A.  Nature and circumstances of the offense

The nature and circumstance of the defendant's offenses are abhorrent.  During A.T.'s abduction, Hairston beat and sexually assaulted A.T., before horrifically burning her to the point where the smell of her burned flesh remained in the car for hours.  As described in detail above, Stanley was an all-too-willing participant in an elaborate kidnaping/carjacking/robbery conspiracy which had *as part of the plan* to torture and burn the victim.

Although this Court must consider other factors beyond the defendant's offense conduct, this Court should nonetheless give significant weight to Stanley's offense conduct in crafting his sentence here.  The torture and burning of A.T. has likely wreaked a lifetime of emotional damage on A.T. and her family.  A sentence of 35 years adequately accounts for the offense conduct.

### B.  History and characteristics of the defendant

The defendant's history and characteristics also weigh strongly in favor the recommended sentence.  As outlined above, the defendant has a significant criminal history dating back to 2008, without any significant periods without unlawful conduct.  His violations of probation, fleeing and eluding police repeatedly, often when his license was suspended, demonstrates that Stanley has no interest in living a crime-free life and has no respect for others.

### C.  The need for the sentence imposed.

There can be no doubt the prevention of violent crimes, particularly the violence committed in this case, constitutes a government objective of surpassing importance.

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring).  As the Eleventh Circuit has explained: "the greater the harm the more

serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612

F.3d at 1206. The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just deserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). Punishment is the way in which

society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and

maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See*

*Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing Royal Commission on Capital

Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)).

Here, the seriousness of the crimes, taken with the need for just punishment and the goal

of promoting respect for the law, weigh heavily in favor of the recommended sentence of 35 years.

### 1. <u>Reflect the seriousness of the offense, promoting respect for the law, and provide just punishment.</u>

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C.

§ 3353(a)(2)(A). The defendant's participation in this violent and sadistic crime not only violated

federal law, but it also transgressed normative principle undergirding our laws. The defendant has

forever affected A.T. and her family. This Court's sentence must express an appropriate level of

social condemnation of his crimes, which are as extreme, violent, and disturbing as any before this

Court.

### 2. <u>Adequate deterrence and need to protect the public.</u>

Stanley has demonstrated that he will not conform his conduct to the laws of society. He

has also shown that he will participate in brazen and disturbing acts of violence and is unconcerned

with the health and safety of others, and is equally unconcerned with the consequences he may face in the courts.  That Stanley willingly participated in these crimes knowing the planned methods, deserves a significant sentence.  That he was present for the worst of the conduct and continued to assist in the crimes reflects on the danger that Stanley poses to the public.  Lest Stanley point to Hairston as the sole person responsible for the worst conduct in this case, Stanley remained a willing collaborator with Hairston after he participated in A.T.'s horrors.  He attempted to aid Hairston and Dorsey in August when they were burglarizing U.S. Fuel by placing a diversionary 911 call.  By his own admission, he was planning additional violent abductions in October when Hairston sought the transfer of the bag of gear.  The sentence of this Court should account for the danger posed by the Stanley, and should seek to guarantee that he does not engage in violent criminal conduct again.  The sentence imposed by this Court should also send the message that individuals who knowingly participate in armed violence and sadistic burning of victims will receive the harshest possible sentence.

### D.  Impact on the Victims

As the Court observed, A.T. testified at trial, and her trauma was demonstrated in different ways.  As to the emotional impact, A.T. feels like a different person than she was before the abduction.  She continues to have flashbacks and regular nightmares that someone is coming after her.  She is afraid to go out at night and is afraid to go far from her home.  Her family describes her as lonely and frequently depressed.  A.T.'s work performance has suffered, and she believes that people, all people, look at her differently.  A.T., a strong woman who set an example for her children, now believes that she is no longer capable of being the head of her family.

### E.  Length of Sentence Imposed

As demonstrated, the defendant's conduct is reprehensible.  His criminal history and conduct in this case show that he is an extremely high risk to recidivate.  He is a danger to the community, regardless of his age.  His conduct must be adequately punished.  A sentence of 35 years, well under the recommended sentence of life imprisonment, adequately accounts for the §3553(a) factors, including the nature of the offense, while still providing the defendant with an opportunity to have a life outside of prison after serving a deservedly long sentence.  The sentence imposed by this Court send the message that violent offenders and those who intentionally maim and torture victims will receive particularly harsh sentences.

Further, the negative and lasting impact that the defendant has wreaked on A.T., *demands* a particularly long sentence.  The need to protect the public from this conduct also demands the recommended sentence.

## IV.  <u>CONCLUSION</u>

Hairston and Stanley devised a plan to abduct and torture A.T. for greed.  No sentence will heal the pain and suffering to A.T. and her—but the sentence in this case should reflect the impact of the defendant's crimes.

A sentence of 35 years' is sufficient but not greater than necessary in this case.  The evidence at trial and the verdicts by the jury established that Stanley was part of the planning of these shocking crimes, and that he helped Hairston as he burned and sexually assaulted A.T. as a form of torture.  He then left A.T. for dead, abandoning her face-down, restrained, and grievously injured in her car.  Simply put, the defendant demonstrated total disregard for human suffering when he planned and participated in the burning and torture of an innocent victim.

Ultimately, the defendant committed shockingly violent and sadistic crimes, and he did so under circumstances that, far from supplying any form of mitigation, demonstrate an utter disregard for human life.  A sentence of 35 years' imprisonment is both required and appropriate.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____

Paul E. Budlow
Spencer L. Todd
Assistant United States Attorneys